Filed 12/29/23  P. v. Johnson CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CLARK LORENZO JOHNSON,<br><br>    Defendant and Appellant. | B318816<br><br>(Los Angeles County<br>Super. Ct. No. BA485308) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

## *INTRODUCTION*

Defendant Clark Lorenzo Johnson was convicted of trafficking three minors for commercial sex acts and attempting to kidnap two sex workers, one of whom he also attempted to traffic. On appeal, he argues the trial court erred by denying his six requests to substitute appointed counsel; his counsel provided constitutionally defective representation by failing to object to testimony by the prosecution's human trafficking expert; and the evidence is insufficient to support one of the trafficking convictions. We affirm.

## *PROCEDURAL BACKGROUND*

By amended information dated August 12, 2021, defendant was charged with two counts of attempted human trafficking (Pen. Code, § 664/236.1, subd. (b); counts 1–2); one count of attempted kidnapping (§ 664/207, subd. (a); count 3); and three counts of human trafficking of a minor to engage in a commercial sex act (§ 236.1, subd. (c)(1); counts 4–6).[1] The information also alleged defendant had sustained one prior strike conviction. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).) Defendant pled not guilty and denied the allegation.

Although defendant sought a speedy trial, proceedings were delayed for over a year due to the Covid-19 pandemic. After a jury trial at which he testified on his own behalf, defendant was found guilty of all counts. In a bifurcated proceeding, the jury found the strike allegation true.

The court denied defendant's motion to dismiss the prior strike under section 1385 and *People v. Superior Court (Romero)*

---

[1] All undesignated statutory references are to the Penal Code.

(1996) 13 Cal.4th 497 and sentenced him to an aggregate term of 36 years in prison.  The court selected count 5 (§ 236.1, subd. (c)(1)) as the principal count and imposed the middle term of 8 years, doubled to 16 years for the prior strike.  The court imposed consecutive terms of 4 years, 8 months—one-third the midterm of 7 years, doubled for the strike prior—for counts 1 and 2 (§ 664/236.1, subd. (b)) and consecutive terms of 5 years, 4 months—one-third the midterm of 8 years, doubled for the strike prior—for counts 4 and 6 (§ 236.1, subd. (c)(1)).  The court stayed sentence on count 3 (§ 664/207, subd. (g)) under section 654.

Defendant filed a timely notice of appeal.

### FACTUAL BACKGROUND

1.  ***Princess, L.M., and Madison Work as Prostitutes***

Sometime around Thanksgiving 2019, high school students Madison M., Princess W., L.M., and Raven drove from San Diego to Los Angeles in a stolen, red Volkswagen Jetta.  All of the girls were minors.  A pimp named S.B. may have also been in the car.

Once Madison, Princess, and L.M. arrived in Los Angeles, they spent several days working for S.B. as prostitutes.[2]  But Madison soon left Princess and L.M. behind and began working for defendant, who went by the name Payso.

Not long after Madison's departure, Princess and L.M. spotted her with defendant in a gray car.  Soon thereafter, Princess and L.M. decided to work for defendant.  Princess made

---

[2]     It is not clear what became of Raven once the girls reached Los Angeles.  Defendant was not charged with any offense related to Raven, and it does not appear that she performed sex work under his direction.  Only Princess testified at trial.

3

the switch from S.B. to defendant because she wanted to stay with Madison.

Defendant was in charge of Princess, L.M., and Madison between approximately November 29 and December 4, 2019. Princess estimated that she saw about 10 clients during this period. All three girls would give defendant the money they earned performing sex work.

The prosecution introduced a photograph of Princess and L.M. captioned "King Payso's Bitch," with a moneybag symbol. Another photograph of Princess was captioned, "Making money moves Bitch." It also included a moneybag.

**2.** ***December 4, 2019 Arrests***

On December 4, 2019, at 3:37 a.m., police saw defendant driving the stolen Volkswagen Jetta. Princess and L.M. were also in the car. Princess was wearing glittery brown shorts and a tight shirt. L.M. was wearing a black shirt, black jacket, and black thong underwear—but nothing else. Defendant and the two girls were taken into custody. (Princess later admitted a joyriding allegation (Veh. Code, § 10851) in the San Diego juvenile court.)

A search of the car revealed $1,700 in cash. Police also recovered a red Skytel mobile phone from the front seat and an iPhone from the back seat. They subsequently extracted the contents of both phones.

The Skytel username was kingpaycasso@kingpaycasso; it contained a photograph of defendant. The phone was logged in to the Instagram account king.paycasso. Many of the messages in the account were addressed to "Daddy" and discussed arrangements for sex work.

The iPhone had the usernames Bitchdusse and Princess

4

Waggs. The call log contained numerous calls to King Paycasso. The phone contained a photo of defendant with the words "Smack Man" and "King Paycasso." There was also a photograph of the stolen Jetta. The windshield was fogged over, and "Daddy" and "Payso" had been written in the condensation.

### 3. *February 12, 2020 Arrest*

On February 12, 2020, Los Angeles Police Department Detective Vanessa Rios and her partner were monitoring Figueroa Boulevard between 65th Street and 66th Street. Other undercover units were nearby. The area, known as "the blade," is one of the largest prostitution tracks in Los Angeles.

Rios observed sex workers standing on different corners. One of the workers, C.T., was at the corner of 66th Street and Denver Avenue, waving down cars. Rios saw a car speed down 66th Street, stop quickly, then reverse. Defendant was in the passenger seat. Defendant yelled at C.T., "Bitch, this is pimping." C.T. tried to walk away without looking at him. Then defendant yelled, "Bitch, there's some pimping going on here" and "you're out of pocket." He continued: "You in the pocket, bitch. You in the pocket." Rios testified that this meant C.T. had another pimp and was ignoring defendant. C.T. walked away, but defendant's car cut her off by driving on the sidewalk. C.T. walked the other direction because she thought defendant was going to rob and kidnap her. The car left C.T. behind and continued north. Detective Rios followed.

This time, defendant jumped out of the car, chased a prostitute later identified as Jane Doe, and tried to grab her. Defendant yelled, "faggot bitch, you're mine." Rios explained this was a derogatory term to refer to someone who is not following the rules and is acting "out of pocket." Defendant aggressively

5

chased Doe, who fled between two parked cars. He rushed towards her, grabbed her right hand, and pulled her towards him. Believing Doe was going to be kidnapped, Rios and her partner got out of their car to intercede. Doe fled on foot, and defendant left by car; he was eventually apprehended.

Following his arrest, defendant made three phone calls from jail, which were recorded and played for the jury. In one of the calls, defendant said he had "caught one of these cases before" and believed the only way he would be convicted was if a witness were to "tell" on him. He believed "there's nobody to tell on me" because the police had intervened. In the second call, defendant reiterated his belief that "there's no one to testify against me." The other caller agreed: "If they don't have a victim, bro, it's a D.A. reject." Defendant explained his strategy: "I'm going to go speedy trial. This month." In the third call, defendant asked an unidentified person to provide information from defendant's Instagram account, which was under the name "The Real King Payso."

4.    *Defendant's Testimony*

Defendant testified on his own behalf.

He explained that at the time of his December 2019 arrest, he had only known Princess for a few days. They first met at a nail salon on December 1, 2019, and went to a hookah lounge later that evening. Defendant communicated with Princess through social media. He used the name King Paycasso on social media because he was an art lover who had worked at The Broad museum.

The evening of December 4, 2019, Princess had invited defendant to a party in downtown Los Angeles. Princess introduced him to L.M. that evening. They went to the party in

6

Princess's car, but Princess asked defendant to drive because she had been drinking.

Defendant did not know that the Jetta was stolen. He testified that the Skytel phone recovered from the front passenger seat was not his, but admitted that he had used it to log on to his Instagram account. He also denied ownership of the iPhone recovered from the back seat.

Defendant denied that Princess and L.M. worked for him as prostitutes. He denied ever meeting Madison.

Defendant testified that on February 12, 2020, he saw his friend's sister near 66th Street and Denver Avenue and stopped to say hello. He told the woman that her brother was looking for her, but she ignored him and turned away. Concerned, defendant got out of the car and tried again to tell the woman that her brother was looking for her. He denied trying to kidnap her. He denied ever trying to persuade or kidnap anyone into prostitution.

When defendant was arrested, he was on probation for driving a car without the owner's consent and on parole for residential burglary. He also admitted a prior conviction for human trafficking of a 13-year-old.

Defendant was convicted of crimes related to all five women. The jury convicted him of three counts of human trafficking of a minor as to L.M., Princess and Madison; attempted human trafficking of C.T.; and attempted human trafficking and attempted kidnapping of Jane Doe.

### DISCUSSION

Defendant contends that the trial court erred, individually and cumulatively, by denying his six requests to substitute appointed counsel; that counsel provided constitutionally

defective representation by failing to object to testimony by the prosecution's human trafficking expert; and that the evidence is constitutionally insufficient to support his conviction for trafficking Madison.

1. ***The Court Did Not Abuse Its Discretion By Denying the* Marsden *Motions***

Defendant made six requests for substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)—the first after nearly a year of Covid-19-related delays, and five others during his trial six months later.  The record reveals defendant's increasing frustration with his circumstances and the way in which his case was proceeding—frustration often directed at his lawyer.  Frustration aside, the record does not support that the attorney–client relationship was so broken that constitutionally ineffective assistance of counsel was likely to result.  We conclude the trial court did not abuse its discretion when it denied the motions.  Rather, the trial court consistently displayed patience, empathy, and determination to protect defendant's constitutional rights during often-heated proceedings.

**1.1. Legal Principles and Standard of Review**

Indigent criminal defendants have a constitutional right to court-appointed trial counsel.  (U.S. Const., 6th Amend.; *Gideon v. Wainwright* (1963) 372 U.S. 335.)  But a defendant does not have an absolute right to more than one appointed attorney.  (*Marsden, supra*, 2 Cal.3d at p. 123.)  The court must appoint substitute counsel when the defendant has shown the first attorney is not providing adequate representation *or* the defendant and the attorney have become embroiled in an irreconcilable conflict that makes ineffective legal representation likely to result.  (*People v. Smith* (1993) 6 Cal.4th 684, 693, 696

8

(*Smith*).)[3]

"[W]hether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court. . . ." (*Marsden*, *supra*, 2 Cal.3d at p. 123.)  When a defendant seeks to discharge appointed counsel and asserts inadequate representation, the court must allow the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.  (*Id.*, at pp. 123–125; *People v. Johnson* (2018) 6 Cal.5th 541, 572.)

"It is the very nature of a *Marsden* motion, at whatever stage it is made, that the trial court must determine whether counsel has been providing competent representation." (*Smith*, *supra*, 6 Cal.4th at pp. 694–695.)  " 'Depending on the nature of the grievances related by defendant, it may be necessary for the court also to question his [or her] attorney.' [Citation.]  [But] 'inquiry into the attorney's state of mind is required only in those situations in which a satisfactory explanation for counsel's conduct or attitude toward his client is necessary in order to determine whether counsel can provide adequate representation.' " (*People v. Winn* (2020) 44 Cal.App.5th 859, 870.)  Typically, once the court has afforded the defendant a reasonable opportunity to express his concerns, the decision to relieve counsel rests within the court's discretion.  (*People v. Rodriguez* (2014) 58 Cal.4th 587, 623 ["If the court holds an adequate hearing, its ruling is reviewed for abuse of discretion"].)

Accordingly, we review both the adequacy of a *Marsden*

---

[3]      We discuss the standard for ineffective assistance of counsel in section 2, *post*.

hearing and the court's denial of a *Marsden* motion for abuse of discretion. (*People v. Abilez* (2007) 41 Cal.4th 472, 488.) " 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' " (*People v. Ng* (2022) 13 Cal.5th 448, 500, cert. denied sub nom. *Ng v. California* (2023) 143 S.Ct. 750.)

### 1.2.  First *Marsden* Hearing

Defendant's *Marsden* motions are best understood against the backdrop of the Covid-19 pandemic.

Defendant was taken into custody on February 12, 2020. At the end of March, he was held to answer and denied bail. On April 20, he was arraigned. Defendant thought the case against him was weak because no victims would be available to testify, and he believed such testimony was legally necessary. His strategy was to assert his right to a speedy trial and proceed as quickly as possible. The matter was duly set for a pretrial conference within the statutory period. Things were proceeding apace.

But then the Covid-19 pandemic hit. Defendant's pretrial hearing date was vacated, and he remained in county jail. Over the next year, as his detention continued, defendant's case was several times delayed.[4]

In November 2020, the court noted that defendant had been "adamant about not waiving time." By February 16, 2021, defendant had become frustrated that his appointed attorney was not visiting him in the jail. Based on the transcripts from that

---

[4]     Defendant does not argue on appeal that the delays violated his constitutional right to a speedy trial.

10

day and the two court dates that followed, it appears counsel resisted going to the jail in person until the prosecution presented a concrete plea offer. Counsel had been attempting to communicate with defendant by phone in the interim.

Things came to a head on March 30, 2021. The court announced that another Covid-19 directive had been issued and defendant's trial would have to be continued yet again. At that point, defendant requested his first *Marsden* hearing.

Defendant explained: "I've been incarcerat[ed] about a year and it's—quite frankly, I'm just, like, my communication's not there." Plea negotiations had seemed like they were starting to progress, but "I don't know if my counsel would really like to see eye to eye on the entire situation I asked about." Defendant wanted counsel to come to the jail to answer his questions, and he was frustrated that the only in-person meetings occurred in court.

Counsel explained to the court that he had set up multiple telephone conversations with defendant and had sent his investigator to meet with defendant at the jail, but defendant often could not be located. Counsel believed "the problem that is happening is not a lack of communication. It's [that defendant] wants to hear something from me that I won't tell him because I'm bound . . . to give a truthful evaluation of his case. And I am."

The court expressed sympathy toward defendant. It explained that visiting the jail had always been difficult—"but this is the worst year we've ever had bar none. And we are not done with it yet, unfortunately." The court stressed that counsel had an obligation to give defendant an honest evaluation of his case, and that an effective lawyer will not sugarcoat the bad parts of a criminal case.

11

With that, the court had reached the crux of the matter. Defendant replied: "Absolutely. I completely understand that. And I've been very patient. I want to go home to my family. . . . That's the whole reason why I want a speedy trial. I understand the issues, but they have obligations, and I pled not guilty." Defendant was not happy with the prosecution's plea offer and wanted his lawyer to understand "the case I'm being charged for is trumped up" and to "tell the D.A. my point of view." Ultimately, defendant wanted to be released from jail.

After suggesting that both defendant and his attorney remain patient and act with mutual understanding, the court ordered them to speak face-to-face after the hearing. Although the court did not formally rule on defendant's *Marsden* motion that day, defendant argues that on six occasions, including this hearing, the trial court abused its discretion in denying *Marsden* relief.

We conclude the court did not abuse its discretion as to either the way it conducted the first *Marsden* hearing or any implied ruling that day not to substitute counsel. As a general matter, the " 'number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1192 (*Cole*).)

### 1.3. Second *Marsden* Hearing

When defendant and his attorney returned to court about a month later, in May 2021, counsel explained that he had been speaking with defendant on the phone and planned to meet with him in person at the jail as soon as the prosecution could provide a firm plea offer. But concerns about Covid-19 persisted, and the delays continued through the spring and summer. On August 3,

2021, the court acknowledged defendant still had no interest in settling or waiving statutory time, and a trial date was set.

The case was finally called for trial on September 7, 2021, but before the first prospective jurors could be sworn, defendant requested another *Marsden* hearing. Defendant explained: "Your Honor, I'd like to bring to the court's attention or awareness that I'm here fighting for my innocence. My counsel, [Defense Attorney], has called me dumb, stupid, used words [such] as 'you people,' to intimidate me. Your Honor, [Defense Attorney] is telling me it's my fault [I'll be] sitting in prison serving a life sentence while I profess my innocence and try to communicate with him." Defendant informed the court that counsel said he would visit the jail in person but had "never showed" and "the majority of the time, he has no consultation with me."

The court first explained that defendant was not facing a life sentence. Then, the court turned to counsel for a response. Counsel replied: "I have never used the word[s] 'dumb' or 'stupid' in my conversations with the defendant." Counsel also denied using "you people." He had, however, "tried to convey to him the seriousness of the case, and, in my opinion, the extreme odds against him on this case, and to tell him everything about what's going to happen because I feel I'm obligated to do that."

Turning to defendant's other concerns: "As far as communications with the defendant, I have seen him in jail. My investigator has seen him in jail. I've had conference calls that he has not appeared at, but when there's not been a conference call, and the next time we were in court, I spent a tremendous amount of time going over everything with him."

Counsel concluded: "There's nothing more I can go over

with him.  It's his choice to go to trial or not.  It is my choice to accurately make sure that he understands the consequences of what will happen.  And yes, I agree this is not a life case, but looking at his age and the amount of years he could face, I have said, 'This could be the rest of your life in prison.' "

The court treated the motion as one under *Marsden* and denied it.  The court explained that although it had "heard annoyance," it had not "heard anything that suggests that Mr. [Attorney] is not performing the functions of counsel."  Nor was the court persuaded that counsel had belittled defendant:  "I've never heard Mr. [Attorney] refer to any defendant as 'dumb,' 'stupid,' or 'those people,' any of that kind of thing.  Lord knows he's represented people on heavy cases in the past."

We conclude the court did not abuse its discretion as to either the way it conducted the second *Marsden* hearing or its decision not to substitute counsel.  Although counsel may have been frustrated that defendant would not accept hard truths about his situation—and defendant may have been frustrated based on his belief that his attorney was not wholeheartedly convinced of his innocence—those frustrations appear nothing more than the frequent give and take of the attorney–client relationship in criminal cases.  They do not reflect an irreconcilable conflict.

Nor was the court required to credit defendant's name-calling allegations.  "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' "  (*Smith, supra*, 6 Cal.4th at p. 696.)  Because the court found defendant's allegations were not credible, it was not required to inquire expressly into counsel's attitude towards his client.  (See, e.g.,

14

*People v. Winn, supra*, 44 Cal.App.5th at p. 870 [inquiry into counsel's state of mind required only where such inquiry is necessary to determine whether counsel can provide adequate representation].)

### 1.4. Third *Marsden* Hearing

On September 9, 2021, the jury was empaneled and testimony began. Trial proceeded smoothly until September 14, when a dramatic outburst in open court led to a third *Marsden* hearing.

After the court explained the schedule to the seated jurors and the prosecutor prepared to call his first witness, defendant interjected: "I would like to address the court." The court told him to wait, but defendant continued: "I cannot and will not continue working with Mr. [Attorney]." As the court tried to quiet defendant, usher the jury out, and gain control over the situation, defendant offered a litany of complaints, including counsel's failure to visit and refusal to ask certain questions: "I can't deal with it. I want him to ask a simple question, and he doesn't ask those questions for me."

The court promptly cleared the courtroom. The court began by admonishing defendant to stop talking when instructed to be quiet and advising him that his outburst did not help him with the jury.

Defendant responded: "I'm sorry, but I have—I take—I can't do it no more. I continue to ask certain things, and I can't get straightforward answers. Every time he talk[s] to me, he got attitude with me. He laughs in my face. He told me I'm going to lose. I'm not dealing with him.

"I'm prepared—man, I can't. I'd rather do this by myself if that's the case. I want someone to fight for my life. And he

15

laughing with the District Attorney. I'd rather study myself if I have to. I can't do this. I'm trying. He didn't even come back there and talk to me. I'm not about to keep dealing with this."

When the court asked what counsel had not done, defendant replied: "A variety of different things." Pressed for specifics, defendant responded that counsel's cross-examinations were too brief and tracked the prosecutor's questions too closely. Counsel refused to ask the questions defendant thought were important—"He didn't bring up most of the different things that I write down and I'm asking him to say, and he's not even saying them"—and defendant was concerned the opportunity was slipping away. For example, defendant explained that when cross-examining a witness the previous day, counsel had not elicited testimony that defendant lacked knowledge the Jetta had been stolen. The court reminded him that counsel had indeed brought out the information defendant sought, and the court provided specific examples of how counsel had done so.

Defendant replied: "I'm—Your Honor, I—the only thing I know is the way that he—he—he makes it seem. It just—two months of him being my counsel is just—this is not my first time. Like I told you, he called me dum[b] before, and he already told me, 'You're going to lose.' He's not—I don't want him. I'll do it myself."

The court found defendant's request for self-representation was involuntary, then explained that although counsel was not bombastic, his style was effective; he had covered all the issues.[5]

---

[5]    Defendant does not challenge this ruling on appeal or argue the court erred by denying his request to represent himself. (See *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).)

The court had observed defendant passing notes to counsel and saw counsel explain that the information defendant sought was inadmissible. The court assured defendant that a number of issues had broken his way during the trial, and concluded he had not received ineffective assistance of counsel. Although the court did not address defendant's complaints that counsel had called him names and was too pessimistic about the likelihood of an acquittal, the court had adequately investigated—and rejected—those concerns at the previous *Marsden* hearing.

We conclude the court did not abuse its discretion as to either the way it conducted the third *Marsden* hearing or its decision not to substitute counsel. (See *Cole, supra*, 33 Cal.4th at p. 1192 [complaints concerning "tactical disagreements . . . do not by themselves constitute an 'irreconcilable conflict' "]; *People v. Hines* (1997) 15 Cal.4th 997, 1026 [where defendant's dissatisfaction was based on attorney's in-court performance, court could rely on its personal observations to evaluate defendant's complaints].)

### 1.5.  Fourth *Marsden* Hearing

As soon as defense counsel appeared in court the following morning, he informed the court that defendant wanted to bring a fourth *Marsden* motion.

This time, defendant was upset that defense counsel had not shown him evidence from the Skytel mobile phone before the prosecutor introduced it at trial. Counsel acknowledged that technical problems had prevented him from sharing certain screenshots with defendant in advance; the discovery had been provided on the eve of trial, and defendant did not want to agree to another delay. Counsel explained, however, that the issue did not affect either counsel's trial preparation or defendant's ability

17

to participate in his defense because defendant was aware of the phone's contents.[6]

When questioned, defendant could not explain what he would have done differently if he had seen the screen shots in advance because "it happened so quickly." As with the dispute over cross-examination, defendant seemed mostly concerned that the evidence would cause the jury to believe he had participated in "the robbery that I had nothing to do with. That wasn't my vehicle. So it's, like, how did I—how can evidence that has nothing to do with a robbery or me be basically turned in on me, used against me, when the car—it's not my car. It's not my belongings."

Defendant had not been charged with robbery or anything related to the stolen Jetta, and the court explained, as it had the day before, that counsel had been laying a foundation to argue that the phone did not belong to defendant. The court found no violation of the right to effective assistance of counsel and denied the motion.

We conclude the court did not abuse its discretion as to either the way it conducted the fourth *Marsden* hearing or its decision not to substitute counsel.

### 1.6. Fifth *Marsden* Hearing

On September 21, during the prosecutor's closing argument, defendant brought his fifth *Marsden* motion. Again,

---

[6] Defendant complains that the court did not ask counsel "if his conduct regarding this evidence resulted from a negative attitude toward appellant and the case." Because counsel had already provided an explanation, which the court apparently accepted, it was not required to inquire further on that point.

defendant focused on mobile-phone-related cross-examination. And again, he objected to receiving late discovery. Counsel provided a detailed explanation of his decision not to bring a witness back for further cross-examination, a strategy the court agreed was sound given the equivocal state of the evidence.

Defendant also raised concerns about one of the jurors, who defendant believed had been asleep the day before. It is not clear how or if this complaint related to the *Marsden* motion, since counsel had moved for a mistrial on that basis when it happened, but the court assured defendant it had been watching the juror like a hawk.

Finally, defendant asserted his right to represent himself under *Faretta, supra,* 422 U.S. 806—but when he acknowledged he was not prepared to proceed with closing argument, the court denied the request as untimely. The court observed: "So we're not continuing the case or delaying it. I understand exactly why you want it, and it's not going to happen."

We conclude the court did not abuse its discretion as to either the way it conducted the fifth *Marsden* hearing or its decision not to substitute counsel. " 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' " (*People v. Welch* (1999) 20 Cal.4th 701, 729.) "Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' " (*Id.* at pp. 728–729.)

### 1.7. Sixth *Marsden* Hearing

Later that day, after the jurors began deliberations, defendant brought his sixth *Marsden* motion. This time, he wanted to make an additional record about the sleeping juror.

Because this concern did not involve a conflict with counsel, we conclude the court did not abuse its discretion as to either the way it conducted the sixth *Marsden* hearing or its decision not to substitute counsel.

### 1.8. Cumulative Error

Even when no single error is prejudicial, aggregate prejudice from multiple errors may render a trial fundamentally unfair. A "series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Defendant contends his six *Marsden* hearings "showed an escalation in the irreconcilable differences between [defendant] and his appointed counsel, and the total breakdown of their attorney–client relationship."

Starting with the second motion, each was more or less a repetition of earlier motions, and each time defendant raised the same or similar problems he had with counsel. The mere fact that defendant made, and the court denied, repeated *Marsden* motions does not by itself establish irreconcilable conflict or cumulative error where none otherwise exists. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 293; see *People v. Ng, supra*, 13 Cal.5th at pp. 481, 495–496, 498–499 [no abuse of discretion where court denied 37 *Marsden* motions].)

## 2. *Ineffective Assistance of Counsel*

Defendant contends Detective Rios exceeded the permissible scope of expert testimony because she offered opinions on ultimate facts that were within the jurors' common knowledge. Since trial counsel's failure to object forfeits the issue on appeal, he argues he received constitutionally defective assistance of counsel. We are not persuaded.

### 2.1.  Challenged Evidence

Rios testified as the prosecution's human trafficking expert.

Rios testified that on the night of February 12, 2020, she saw defendant speeding; he yelled out the passenger window, "Bitch, this is pimping."  Rios testified that by using this terminology, defendant was identifying himself as a pimp and trying to catch a prospective prostitute by calling her a bitch.  Rios then heard defendant yell, "Bitch, you in the pocket.  You in the pocket."  Rios understood this to mean that C.T. was following the rules of the game.  Rios also testified that C.T. did not make eye contact with defendant, which indicated she worked for another pimp.  After leaving C.T., defendant yelled, "Faggot bitch, you're mine" and attempted to grab Jane Doe.  In Rios's experience, "faggot bitch" was a derogatory term for a prostitute who was out of pocket and not following the rules of the game.  Defendant contends this testimony exceeded the proper scope of expert testimony by applying definitions to defendant's actual conduct and concluding the conduct was that of a pimp engaged in human trafficking.

Rios was also shown text messages and photographs from the Skytel phone seized from the Jetta.  She explained that the names, words, and symbols in the messages referred to prostitution activities.  Defendant contends Rios exceeded the bounds of permissible expert opinion by reading the messages aloud to the jury, interpreting what they meant based on the definitions she had provided earlier in her testimony, and positing that defendant posted the messages in furtherance of his pimping and human trafficking activities.

### 2.2.  Defendant forfeited his challenge to the evidence.

The rules of evidence are not self-executing.  We may not

21

reverse a judgment or verdict based on "the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion[.]"  (Evid. Code, § 353, subd. (a).)  This rule exists to give the trial court a concrete legal proposition to pass on, to allow the proponent of the evidence an opportunity to cure the defect, and to prevent abuse.  (*People v. Partida* (2005) 37 Cal.4th 428, 434.)  Defendant concedes trial counsel did not object to Rios's testimony on the ground he now asserts, thereby forfeiting his challenges to it on appeal, but argues that failure amounted to ineffective assistance of counsel.

### 2.3.   Ineffective Assistance of Counsel

Under either the federal or state Constitution, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)  To establish ineffective assistance of counsel, defendant must satisfy two requirements.  (*Id*. at pp. 690–692.)

First, he must show his attorney's conduct was "outside the wide range of professionally competent assistance."  (*Strickland*, *supra*, 466 U.S. at p. 690.)  Then, he must demonstrate the deficient performance was prejudicial—i.e., there is a reasonable probability that but for counsel's failings, the result of the proceeding would have been different.  (*Id*. at p. 694.)  "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the

22

result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

Typically, if "the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) These arguments should instead be raised on collateral review. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

Defendant argues counsel had no conceivable tactical basis not to object because he "*did object* to the testimony of Detective Rios as beyond her area of expertise." He posits that this shows counsel "wanted to keep out this evidence." Unlike the objections counsel actually offered, however, objecting on the grounds now advanced would not necessarily have led to wholesale exclusion of the testimony.

Defense counsel could have reasonably expected that objecting would instead prompt the prosecutor to elicit the same information by asking detailed hypotheticals tracking the facts of the case—an approach that would only highlight the evidence to the jurors. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 [expert may testify in response to hypothetical question that relates to ultimate issue to be decided by the jury but cannot testify that a defendant's actions establish his criminal intent].)

Because we can discern that defense counsel may have had a plausible tactical reason not to object, we conclude defendant has not established on this record that he received constitutionally inadequate representation.

23

### 3. *Sufficiency of the Evidence for Trafficking Madison (Count 6)*

Defendant was charged in court 6 with human trafficking of Madison for purposes of pimping. (§ 236.1, subd. (c).) A criminal defendant may not be convicted of a crime unless the prosecution proves every fact necessary for conviction beyond a reasonable doubt. (U.S. Const., 5th & 14th Amends.; see Cal. Const., art. I, §§ 7, 15; *In re Winship* (1970) 397 U.S. 358, 364; *People v. Tenner* (1993) 6 Cal.4th 559, 566.) Defendant contends there is insufficient evidence to support his conviction for trafficking Madison. We disagree.

#### 3.1. Standard of Review

In assessing the sufficiency of the evidence to support a conviction, we review the entire record to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may not reweigh the evidence or resolve evidentiary conflicts (*People v. Young* (2005) 34 Cal.4th 1149, 1181), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242).

The same standard applies where the conviction rests primarily on circumstantial evidence. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.' [Citation.] Simply put, if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Farnam* (2002) 28 Cal.4th 107, 143.)

In sum, "reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.)

### 3.2. Elements of Sex Trafficking

To convict defendant of trafficking Madison for a commercial sex act (§ 236.1, subd. (c)(1)), as charged in count 6, the prosecution was required to prove:

- Defendant caused, induced, or persuaded Madison to engage in a commercial sex act—or intended to do so;
- When defendant acted, he intended to commit the crime of pimping (§ 266h); and
- When defendant did so, Madison was under 18 years of age.

(§ 236.1, subd. (c); see CALCRIM No. 1244.) To prove the second element—that defendant intended to commit pimping—the prosecution had to prove:

25

- Defendant knew Madison was a prostitute; *and*
- The money or other proceeds Madison earned as a prostitute supported defendant, in whole or in part; *or*
- Defendant asked for payment or received payment for soliciting prostitution customers for Madison.

(§ 266h; see CALCRIM No. 1150.)

### 3.3. Substantial evidence supports defendant's conviction for trafficking Madison.

Defendant concedes substantial evidence supports his convictions for trafficking Princess and L.M. (counts 4 and 5) but contends the evidence is constitutionally inadequate to support his conviction for trafficking Madison (count 6). He argues that unlike Princess and L.M., Madison "had a level of autonomy and leadership in the business arrangement . . . ." We are not persuaded.

First, convictions for trafficking non-testifying minor victims often rest on circumstantial evidence. (See *People v. Campbell* (2020) 51 Cal.App.5th 463, 487–488 [three testifying victims offered substantial evidence defendant encouraged eight non-testifying victims to engage in prostitution where defendant assisted the women with prostitution-related activities].) In this case, only Princess testified. Madison did not. Although Princess's testimony often lacked detail, it would have been reasonable for the jury to infer from it that Madison, Princess, and L.M. had similar relationships with defendant. The girls traveled together from San Diego to Los Angeles sometime after November 25, 2019. Princess identified herself, L.M., and Madison in several photographs taken during the period the

26

three women were in Los Angeles making money working as prostitutes. When they arrived, they spent a couple of days working as prostitutes for S.B. After Madison left to work for defendant, the other two girls followed her because they wanted to stay together. Defendant was in charge of three of them between approximately November 29 and December 4, 2019. Taken together, the three girls spent about 10 days in Los Angeles; during that time, all three worked for S.B. for a couple of days, and all three worked for defendant for about a week. It is reasonable to infer from this timeline that Madison worked for defendant for only a day or so longer than the others. Based on this inference, the jury could reasonably deduce that Madison's relationship with defendant was not appreciably different or more autonomous than his relationship with the other two girls.

Second, the jury could infer from Princess's testimony that defendant had facilitated Madison's prostitution. (*People v. Zambia* (2011) 51 Cal.4th 965, 980, 989 [intent to influence may be inferred from acts of assistance].) Princess testified that she first encountered defendant when she saw defendant driving Madison around. Princess also testified that she gave her earnings to defendant because she had seen Madison do so. Madison was a "girl[ ] in the group" and one of her "wifies" because they worked for the same person. The jury could reasonably infer from this conduct that defendant taught Madison how to behave and thereby caused her to engage in sex work. (§ 236.1, subd. (c).)

Finally, the jury could have used defendant's prior sex-trafficking conviction as evidence that he had a propensity to commit—and did commit—sex trafficking of Madison. "Evidence of prior criminal acts is ordinarily inadmissible to show a

defendant's disposition to commit such acts. [Citation.] However, the Legislature has created exceptions to this rule in cases involving sexual offenses . . . ." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) Evidence Code section 1108 "allows evidence of the defendant's uncharged sex crimes to be introduced in a sex offense prosecution to demonstrate the defendant's disposition to commit such crimes." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009.)

Here, the jury heard evidence that defendant had previously been convicted of trafficking a 13-year-old girl. The court admitted into evidence the transcript of the preliminary hearing at which defendant was held to answer.[7] According to the transcript, defendant taught the victim "the ways of being a prostitute." Defendant picked the victim up from her house and drove her to Figueroa Boulevard, where he would give her condoms, set prices for various sex acts, and tell her how many acts to perform. When the victim completed her quota, defendant would pick her up, and the victim would pay him a portion of her earnings.

The jury was instructed under Evidence Code section 1108 that if it concluded "defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit human trafficking of a minor for a commercial sex act . . . as charged in Count[ ] . . . Six . . . ."

To be sure, as defendant stresses, the evidence against him

_____

[7] The transcript was admitted at defense counsel's request.

28

was stronger as to Princess and L.M because it included incriminating text messages and photographs recovered from the phones in the stolen Jetta—evidence that did not directly pertain to count 6. Taken as a whole, the evidence—although perhaps less persuasive than that for the other counts—was constitutionally sufficient to support defendant's conviction for count 6.

### DISPOSITION

The judgment is affirmed.

RUBIN, P. J.

I CONCUR:

MOOR, J.

29

The People v. Clark Lorenzo Johnson
B318816


BAKER, J., Concurring


I join the opinion for the court with the exception of its reliance on Evidence Code section 1108 propensity evidence to conclude substantial evidence supports defendant and appellant Clark Johnson's (defendant's) conviction of human trafficking in count six. I believe substantial evidence supports defendant's conviction on that count without need to rely on a judgment that he has a general propensity to commit sex offenses.


                    BAKER, J.